United States District Court
Southern District of Texas
**ENTERED**
August 27, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DENIS  ARGUETA, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:19-CV-3602 |
| | § | |
| TAG ELECTRIC COMPANY, L.P., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant TAG Electric Company, L.P.'s ("TAG Electric") Motion for Summary Judgment. (Dkt. 21). After carefully reviewing the briefing, summary judgment evidence, and caselaw, the motion for summary judgment is **GRANTED**.

### I.      FACTUAL BACKGROUND

This is an employment discrimination and retaliation case brought by three former employees of TAG Electric, Denis Argueta, Abelardo Cortez, and Mauricio Ramirez (collectively, "Plaintiffs"). Plaintiffs claim that while they were employed as Journeymen electricians, TAG Electric discriminated against them on the basis of their religion, their race, and their national origins; all three plaintiffs are Catholic and Hispanic. Cortez is Spanish, and Ramirez and Argueta are Salvadorean.

TAG Electric provides commercial electrical contracting services in Houston, Texas and the surrounding areas, including at George Bush International Airport. Darren Vaughn

is the superintendent at the airport, and he oversees numerous smaller projects at that location. (Dkt. 21-1 at para. 3).

During the time in question, Argueta was a leadman on the Fleet Maintenance Facility and Transportation projects. The title of leadman is an unofficial one; leadmen work under project leaders or foremen and oversee four or more men, ensuring that the men complete the tasks on the project according to the foreman's directions. (Dkt. 21-1 at para. 3). For several weeks before and after Good Friday in 2018, Argueta worked on the Transportation Center project. He requested and took off work on Good Friday, which fell on March 30, 2018. (Dkt. 21-1 at para. 4). On April 2, 2018, Argueta received a $2 per hour base wage increase. (Dkt. 21-1 at para. 4; Dkt. 21 at Ex. 6). Shortly after Good Friday, Argueta was moved from the project he was working on at the airport to the Service Department because work was winding down on the airport project. All of the electricians who remained on the airport project had received badges from the United States Department of Homeland Security, Customs and Border Protection Division (CBP) which allowed them to access secure areas. Argueta was not able to obtain a badge because of Green Card issues. All of the electricians who remained staffed on the airport projects had CBP badges. (Dkt. 21-1 at para. 10).

Ramirez also requested time off for Good Friday on March 30, 2018. About two weeks later, he was removed from a project at the airport along with three other electricians because work at the airport was slowing down. Like Argueta, Ramirez did not have a current CBP badge. Ramirez's badge had expired on March 31, 2018. Ramirez's badge renewal application was denied because of an incomplete criminal history as a result of his

"fail[ure] to disclose and provide certified Court documents for 2014 offense." (Dkt. 21-1 at para. 11, ex. 3). Vaughn emailed Ramirez and asked him to complete the application forms so that Vaughn could take them to the CBP office. (Dkt. 21-1 at Ex. 3).

Cortez requested a transfer from the airport project. He was transferred as requested, but to the Tool-Flo project which was about forty-five minutes from his house instead of the Sumner project that was only fifteen miles away from his house even though he believed there was an opening on the Sumner project. (Dkt. 22-2 at 23:7–24:15, 50:8–14).

Plaintiffs allege that Vaughn, their supervisor, referred to all Hispanic employees as "Mexicans" several times regardless of their national origins, although they allege that he did so only once in a derogatory manner. (Dkt. 22-2 at 8:21–9:4, 10:2–7). They also assert that Vaughn required them to use the company's older service van while Caucausian employees were allowed to use newer vehicles, and that Vaughn referred to the older van as the "Mexican van." (Dkt. 1 at para. 25, Dkt. 22-1 at 22:21-23:17).

In April 2018, Plaintiffs complained about discrimination to the president of TAG Electric, Juanita Gonzales and had a meeting with her and several other people, including the vice president of the company, to go over their allegations. Gonzales assigned Shawn Lampton, a Senior Project Manager at TAG Electric, to investigate the complaints. (Dkt. 21-1 at para. 15). Lampton interviewed seven electricians who had worked with Vaughn, all of whom stated that they were unaware of any discrimination or derogatory comments made by Vaughn. Although Lampton told Gonzales that he could not corroborate the complaints made against Vaughn, he and two foremen were warned that they should refrain from comments or actions that could be construed as discriminatory or derogatory and that

they would be fired if the allegations were substantiated. All foremen, including Vaughn, were also required to attend "Diversity, Inclusivity, Sensitivity, and Harassment (D.I.S.H.) Training. (Dkt. 21-1 at para. 15).

Ramirez resigned on September 14, 2018. (Dkt. 22-3 at 64:25–65:3). Argueta resigned on September 26, 2018. (Dkt. 22-1 at 78:18–22). Cortez resigned on January 6, 2020. (Dkt. 22-2 at 22:14–18). They filed this lawsuit against their former employer alleging discrimination on the basis of their race, religion, and national origin, retaliation, and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the Texas Commission on Human Rights Act. (Dkt. 22 at pp. 5–6). Tag Electric filed a motion for summary judgment on the grounds that none of the plaintiffs can establish a prima facie case of unlawful discrimination or retaliation. The Court agrees.

## II.    STANDARD OF REVIEW

### a.  Summary Judgment Standard

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Burrell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 136 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). A fact is material if "its resolution could affect the outcome of the action." *Nunley v. City of Waco*, 440 F. App'x 275, 277 (5th Cir. 2011). The court must view the facts in the light most favorable to the nonmoving party and must draw all

reasonable inferences from them. *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018).

Where the non-movant bears the burden of proof at trial the movant may merely point to the absence of evidence; once they have, the burden shifts to the non-movant to show that there is an issue of material fact warranting trial. *Kim v. Hospira, Inc.*, 709 F. App'x 287, 288 (5th Cir. 2018) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)).

If the movant produces evidence that tends to show that there is no dispute of material fact, the nonmovant must then identify evidence in the record sufficient to establish the dispute of material fact for trial. *Celotex*, 477 U.S. at 321–23. The party opposing summary judgment must identify specific evidence in the record and articulate how that evidence supports its claim. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertion, or by only a scintilla of evidence.'" *Jurach v. Safety Vision, L.L.C.*, 642 F. App'x 313, 317 (5th Cir. 2016) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)). The nonmovant must "go beyond the pleadings and by her own affidavits, or by depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue of material fact for trial." *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 493 (5th Cir. 2001) (citing *Celotex*, 477 U.S. at 324). "If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on

which it will bear the burden of proof at trial, summary judgment must be granted." *Celotex*, 477 U.S. at 322–23.

### b. Title VII

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Title VII also makes it unlawful for an employer to retaliate against employees who have opposed discrimination or who have engaged in "protected activities." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 269 (2001).

Unlawful discrimination under Title VII can be established through either direct or circumstantial evidence. *Wallace v. Methodist Hosp. Sys.* 271 F.3d 212, 219 (5th Cir. 2001). Because Plaintiffs set forth no direct evidence of disparate treatment, their claims are analyzed using the *McDonnell Douglas* test. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).

### i. Disparate Treatment

Disparate treatment on the basis of a protected characteristic is a violation of Title VII. Where a plaintiff does not provide direct evidence of discrimination, Title VII claims proceed under the *McDonnell Douglas* framework. *See McDonnell Douglas Corp.*, 411 U.S. at 802–05. "Analysis under the well-established *McDonnell Douglas* framework proceeds as follows: (1) the plaintiff must first establish a prima facie case of discrimination; (2) the burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for the employment action; and if that burden is satisfied, (3) the plaintiff must offer evidence that the proffered reason is a pretext for racial discrimination."

*Knatt v. Hosp. Serv. Dist. No. 1 of E. Baton Rouge Par.*, 327 F. App'x 472, 482 (5th Cir. 2009).

To establish a prima facie case under the *McDonnell Douglas* framework, a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) he was treated less favorably than "similarly situated" employees who were not members of the protected class. *See, e.g., Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004).

Once a plaintiff establishes a prima facie case of discrimination, the burden of production of evidence shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 590 (5th Cir. 2016) (quoting *EEOC v. Chevron Phillips Chem. Co., L.P.*, 570 F.3d 606, 615 (5th Cir. 2009).

If the employer meets its burden of production, the burden then shifts to the plaintiff to "produce evidence from which a jury could conclude that the employer's articulated reason is pretextual." *Id.* "A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Thomas v. Johnson*, 788 F.3d 177, 179 (5th Cir. 2015) (quoting *Laxton v. Gap, Inc.*, 335 F.3d 572, 578 (5th Cir. 2003). "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–48 (2000).

###### ii.  Hostile Work Environment

To establish a hostile work environment claim based on race under Title VII requires a plaintiff to show that he "(1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Hernandez v. Yellow Transp., Inc.*, 670 F3d 644, 651 (5th Cir. 2012). "Harassment affects a 'term, condition, or privilege of employment' if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* (citing *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)). Courts determine whether a hostile work environment exists using a totality of the circumstances test that focuses on the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance. *Turney v. Baylor Richardson Med. Ctr.* 337, 347 (5th Cir. 2007). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) are not enough." *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 401 (5th Cir. 2013) (citation omitted).

###### iii.  Retaliation

Title VII forbids retaliation against individuals who oppose discrimination or participate in certain Title VII processes. 42 U.S.C. § 2000e-3(a). To establish a prima facie case for retaliation under Title VII, a plaintiff must show that "(1) [he] engaged in activity protected by Title VII; (2) the employer took adverse employment action against [him];

and (3) a causal connection exists between that protected activity and the adverse employment action." *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015). To be considered an adverse action under the retaliation prong, "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

As with traditional discrimination claims, courts employ the *McDonnell Douglas* burden-shifting framework to analyze Title VII retaliation claims. "If the employee establishes a prima facie case, the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision. After the employer states its reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation." *LeMaire v. Louisiana Dep't of Transp. & Dev.*, 480 F.3d 383, 388–89 (5th Cir. 2007) (internal citations omitted).

### a.  42 U.S.C. § 1981 & the Texas Commission on Human Rights Act

The analysis under Title VII and 42 U.S.C. § 1981 is identical. *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005). Because the general purpose of the Texas Commission on Human Rights Act is to "provide for the execution of the policies of Title VII," Texas courts rely on federal law to interpret that statute. *See In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 308–09 (Tex. 2010). Accordingly, the Court will discuss only Title VII law when evaluating Plaintiffs' claims. *See Hernandez*, 670 F.3d at 650.

### III.    LEGAL ANALYSIS

### a.  None of the Plaintiffs can make out a prima facie case for disparate treatment under the *McDonald Douglas* framework.

As stated above, to establish a prima facie case for disparate treatment, Plaintiffs must show that (1) they are members of a protected class; (2) they were qualified for their positions; (3) they were subject to an adverse employment action; and (4) they were treated less favorably than "similarly situated" employees who were not members of their protected class. *See, e.g., Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004).

TAG Electric does not dispute that Plaintiffs are members of a protected class or that they were qualified for their positions as Journeymen electricians. However, none of the plaintiffs can establish that there is a genuine issue of material fact as to whether they were subject to an adverse employment action or whether a similarly situated employee outside of their protected class was treated more favorably than they were.

First, none of the plaintiffs established that there is a genuine issue of material fact as to whether they were subjected to an adverse employment action. "Adverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). "[A]n employment action that 'does not affect job duties, compensation, or benefits' is not an adverse employment action." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) (quoting *Banks v. E. Baton Rouge Par. Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003)).

Plaintiffs allege that shortly after they requested time off to observe Good Friday in 2018, they were "transferred" from the projects that they had been working on at the airport to less desirable projects. (Dkt. 1 at para. 29). They also allege that after they complained about discrimination in April 2018, Gonzales did not take remedial action and Plaintiffs allege that they were constructively discharged since the harassment continued. (Dkt. 22 at pp. 11–12, 15–17).

Reassigning Plaintiffs from one project to another did not constitute an adverse employment action. As commercial electricians, Plaintiffs were assigned to jobs based on the progress of the job and the construction schedule. (Dkt. 21-1 at para. 8). A transfer may be considered an adverse employment action if it is functionally equivalent to a demotion. *Benningfield v. City of Houston*, 157 F.3d 369, 377 (5th Cir. 1998). "To be equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement." *Sharp v. City of Houston*, 164 F.3d 923, 933 (5th Cir. 1999) (citations omitted). In this case, there is no evidence in the summary judgment record that the new projects that Plaintiffs were assigned to were objectively worse than any other projects. Plaintiffs were not paid less, nor were their job titles changed. (Dkt. 21-1 at paras. 5, 8). Accordingly, Plaintiffs' reassignments to different projects do not constitute demotions or adverse employment actions.

Plaintiffs also allege that they were constructively discharged and forced to resign because of the harassment they allegedly experienced. "A resignation is actionable under Title VII . . . only if the resignation qualifies as a constructive discharge." *Brown v. Kinney*

*Shoe Corp.*, 237 F.3d 556 (5th Cir. 2001). "To prove a constructive discharge, a plaintiff must establish that the working conditions were so intolerable that a reasonable employee would feel compelled to resign." *Id.* (quotation marks omitted). Courts in the Fifth Circuit consider the following factors when determining whether an employee was constructively discharged:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Id*. (alteration omitted). Plaintiffs allege that three of the factors are present in this case: (1) reassignment to menial or degrading work, (2) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation, and (3) offers of continued employment on terms less favorable than the employee's former status. (Dkt. 22 at p. 16).

Argueta argues that he was demoted following his religious accommodation request and his complaints of discrimination because even though his job title remained the same, "the tasks he was assigned were different and were labor intensive tasks including digging ditches and these were not tasks he was performing prior to his complaint." (Dkt. 22 at p. 17). In support of his claim that he was demoted, the only evidence that Argueta provides is his own deposition testimony, in which he stated that he knew that he was demoted

because after he returned to work following the Good Friday that he requested off as a religious accommodation, he was placed on a different project; he testified at his deposition that his supervisor, Vaughn, told him that he was no longer needed on the fleet maintenance project. (Dkt. 22 at p. 17; Dkt. 22-1 at 28:6–15, 31:15–23). This "demotion" occurred prior to Argueta's meeting with Gonzales and other company officials at which he complained about discrimination. (Dkt. 22-1 at 35:6–17).

Cortez contends that after he requested a transfer away from the airport project, he was transferred to the Tool-Flo project that was forty-five minutes away from his house instead of the Sumner project that he believed was available and which was only fifteen minutes away from his house. (Dkt. 22-2 at 23:7–23). However, other than Cortez's own deposition testimony, there is no evidence in the summary judgment record that there actually was an open position for a journeyman electrician on the Sumner. Furthermore, even if there was a position available on the Sumner project, assigning Cortez to a project that was farther away from his house does not constitute an adverse employment action. Although a longer commute may have been inconvenient for Cortez, it does not demonstrate that the new position was objectively worse such that it was the equivalent of a demotion. *See Cooper v. United Parcel Service*, 368 Fed. App'x 469, 474 (5th Cir. 2010) (finding that there was no adverse employment action when the employee was transferred to another location, which increased the employee's commuting time, where the employee retained the same title and benefits in the new position).

Plaintiffs also contend that while they were working on projects at the airport, Vaughn referred to them as "Mexicans" regardless of their national origin. Cortez testified

at his deposition that only once was the term used in a derogatory manner. (Dkt. 22-2 at 9:17–10:14, 11:9–12:13). During Argueta's deposition, he too only gave one example of an instance when Vaughn referred to him as "Mexican" in a derogatory manner. (Dkt. 22-1 at 23:22–24:21).

Constructive discharge requires a greater severity or pervasiveness of harassment than that required by a hostile work environment claim. *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998) (citing *Landgraf v. USI Film Products*, 968 F.2d 427, 429 (5th Cir. 1992). "Discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge, as is a discriminatory failure to promote." *Brown*, 237 F.3d at 566 (citations omitted).

The Court finds that transferring Argueta and Cortez to different projects did not constitute an adverse employment action sufficient to satisfy the third element of Plaintiffs' prima facie case of discrimination, nor does it constitute a reassignment to menial or degrading work as an element of constructive eviction. The summary judgment evidence is insufficient for a juror to find that a reasonable employee would have felt compelled to resign. Employees were frequently moved from one project to another depending on the needs of the company. The tasks that electricians were asked to perform depended on the needs of the project and were not menial or demeaning. Even if the employees were referred to as "Mexicans" on an almost daily basis, as reflected in Cortez's deposition, this does not create a fact issue as to whether the working conditions were so intolerable that no reasonable person could have worked under those conditions. (Dkt. 22-2 at 10:8–21). *See Brown*, 237 F.3d at 566.

Nor does Cortez's shift change from the day shift to the night shift and back constitute an adverse employment action. A mere change in an employee's work hours is not sufficient in itself to constitute an adverse employment action. *See Benningfield*, 157 F.3d at 377) (rejecting the argument that a transfer to the night shift was an adverse employment action). Plaintiffs have not presented any evidence that the shift change constituted a demotion or made the job objectively worse.

Lastly, to establish disparate treatment as evidence of circumstantial proof of a discriminatory motive, a plaintiff must demonstrate that a similarly situated employee who is not a member of their protected class was treated differently. *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405–06 (5th Cir. 2005). For employees to be considered similarly situated, the employees' circumstances "must have been nearly identical." *Perez v. Tex. Dep't of Crim. Just.*, 395 F.3d 206, 213 (5th Cir. 2004).

Even if Plaintiffs' resignations or Cortez's shift changes could constitute adverse employment actions as constructive discharges, Plaintiffs cannot satisfy the fourth and final element of their prima facie discrimination case. Although Plaintiffs testified that Caucasian employees were permitted to use TAG Electric's newer vehicles while Hispanic employees were assigned to an older vehicle and that Hispanic employees were written up for policy violations while Caucasian employees were not, there is no evidence in the summary judgment record to raise a fact issue as to whether the Caucasian employees who were allegedly treated differently than the Hispanic circumstances were similarly situated to the Plaintiffs. (Dkt. 22-1 at 68:21–24; Dkt. 22-2 at 29:18–21). There is no evidence in the record about the names of the Caucasian employees who were treated better, let alone

their education, experience, or other information that would allow the Court to determine whether they were similarly situated to the Plaintiffs.

      **b. Even if Plaintiffs were able to establish a prima facie case of discrimination, there is no evidence that Defendant's legitimate, nondiscriminatory reasons for its actions are pretextual.**

If Plaintiffs were able to raise a genuine issue of material fact as to the elements of their prima facie discrimination case, the burden of production would switch to TAG Electric to demonstrate that they had a legitimate, nondiscriminatory reason for the adverse employment action. *See Cannon*, 813 F.3d at 590. If TAG Electric meets its burden of production, the burden then shifts back to Plaintiff to "produce evidence from which a jury could conclude that the employer's articulated reason is pretextual." *Id.*

Here, TAG Electric has provided competent summary judgment evidence that Plaintiffs were moved from the airport projects because work was slowing down at the airport and because none of the Plaintiffs were able to get clearance badges from CBP to access the secure areas of the airport where some of the projects took place. (Dkt. 21-1 at paras. 9–13). After the reduction of workforce at the airport, all remaining electricians had CBP access. (Dkt. 21-1 at para. 10). When Cortez requested to be reassigned from the airport project, Lampton emailed company personnel a list of electricians who had already received their CBP badges who could replace Cortez at the airport. (Dkt. 21-1 at Ex. 5).

To carry their burden of proving that TAG Electric's proffered reason is pretext for its real discriminatory or retaliatory purpose, Plaintiffs must rebut each nondiscriminatory or nonretaliatory reason articulated by the employer. *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007). Here, with the exception of Cortez, who requested to be

transferred away from the airport project, Plaintiffs do not dispute that they did not have badges that allowed them to access the secure areas of the airport. (Dkt. 21- at 34:14–37:13). They also do not dispute that all of the electricians who remained staffed on the airport projects had the access badges.

Accordingly, even if Plaintiffs were able to make out their prima facie discrimination case, they have not presented competent summary judgment evidence to establish that there is a genuine issue of material fact as to whether TAG Electric's legitimate, nondiscriminatory reasons were pretextual.

### c. Plaintiffs have not raised a genuine issue of material fact as to their hostile work environment claim.

To make out their claims for hostile work environment, Plaintiffs must show that they "(1) belong[ ] to a protected group; (2) [were] subjected to unwelcome harassment; (3) the harassment complained of was based on race [or national origin]; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Hernandez*, 670 F3d at 651.

Plaintiff's claims for hostile work environment in this case rest on one incident in 2016 in which Vaughn allegedly told an employee to "get in the fucking Mexican van and go to work." (Dkt. 22-1 at 24:1–21). Plaintiffs also testified that Vaughn "periodically" called Hispanic employees "Mexican" regardless of their national origin, although not in a derogatory manner. (Dkt. 22-2 at 10:1–16).

For harassment to affect a term, condition, or privilege of employment, "the conduct complained of must be both objectively and subjectively offensive. Thus, not only must

the victim perceive the environment as hostile, the conduct must also be such that a reasonable person would find it to be hostile or abusive." *E.E.O.C. v. WC&M Enters., Inc.*, 496 F.3d 393, 399 (5th Cir. 2007). Occasionally referring to Hispanic employees as "Mexican" in a nondisparaging manner is not severe enough to affect a term, condition, or privilege of employment, nor does a single use of the word "Mexican" in a derogatory manner. This is evidenced by the fact that after being reassigned to a different project, Argueta sent an email to Thomas Gonzales, the vice president of TAG Electric, and asked if he could continue to work on the airport project under the supervision of Vaughn. (Dkt. 21-3 at Ex. 3).

Even if Plaintiffs were able to raise a genuine issue of material fact as to whether the harassment that they allegedly experienced was severe enough to affect a term or condition of employment, Plaintiffs are unable to satisfy the final element of their hostile work environment claim: that TAG Electric knew of the harassment and failed to take prompt remedial action. Although determining what constitutes prompt remedial action is a fact-specific inquiry, in certain circumstances the Fifth Circuit has held that an employer took prompt remedial action as a matter of law. *Williams-Boldware v. Denton Cty., Tex.*, 741 F.3d 635, 640 (5th Cir. 2014). Prompt remedial action has been found as a matter of law when the employer "took the allegations seriously, it conducted prompt and thorough investigations, and it immediately implemented remedial and disciplinary measures based on the results of such investigations. *Carmon v. Lubrizol Corp.*, 17 F.3d 791, 795 (5th Cir. 1994) (per curiam). "Employers are not required to impose draconian penalties upon the offending employee in order to satisfy this court's prompt remedial action standard.

*Williams-Boldware*, 741 F.3d at 640. In circumstances where the offending conduct is infrequent or isolated, a reprimand may qualify as a prompt remedial measure. *Waymire v. Harris Cty., Tex.*, 86 F.3d 424, 429 (5th Cir. 1996).

In this case, once Plaintiffs complained of harassment, Gonzales instructed Vaughn's supervisor, Lampton, to investigate complaints of discrimination involving Vaughn. Lampton interviewed seven electricians who worked with Vaughn, all of whom stated that they were not aware of any discrimination or derogatory statements. (Dkt. 21-1 at para. 15). When Lampton was not able to substantiate the complaints made against Vaughn, he orally reprimanded Vaughn and the two other foremen that they should refrain from comments or actions that could be construed as racist or discriminatory. All managers were also required to attend Diversity, Inclusion, Sensitivity, and Harassment Training. (Dkt. 21-1 at para. 15). The Court holds as a matter of law that TAG Electric's response was sufficient to constitute prompt remedial action.

### d. Plaintiffs have not raised a genuine issue of material fact as to their retaliation claims.

To establish a prima facie case for retaliation, Plaintiffs must show that "(1) [they] engaged in activity protected by Title VII; (2) the employer took adverse employment action against [them]; and (3) a causal connection exists between that protected activity and the adverse employment action." *Zamora*, 798 F.3d at 331. As discussed above, Plaintiffs are unable to show that either their reassignments from the airport project or their resignations constitute adverse employment actions for the purposes of Title VII. Accordingly, Plaintiffs are unable to make out prima facie case of retaliation.

     **e.   Even if Plaintiffs were able to make out a prima facie case of retaliation, there is no evidence that Defendant's legitimate, nonretaliatory reasons for its actions are pretextual.**

"An employee establishes pretext by showing that the adverse action would not have occurred 'but for' the employer's retaliatory reason for the action." *Coleman v. Jason Pharmaceuticals*, 540 Fed. App'x 302, 304 (5th Cir. 2013) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). "In order to avoid summary judgment, the plaintiff must show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the action 'but for' the protected activity." *Id.* (citing *Long v. Eastfield College*, 88 F.3d 300, 308 (5th Cir. 1996)).

Furthermore, as stated above, Plaintiffs have failed to demonstrate that there is a conflict in substantial evidence relating to TAG Electric's proffered reasons for moving Plaintiffs from the airport projects. Plaintiffs were unable to obtain access badges from CBP to access the secure areas at the airport where parts of the project took place. Accordingly, Plaintiff's retaliations claims fail.

## IV.   CONCLUSION

For the aforementioned reasons, TAG Electric's motion for summary judgment is **GRANTED**. All pending motions are denied as moot. The Court will issue a final judgment simultaneously with this opinion.

SIGNED at Houston, Texas, this 27th day of August, 2021.

GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE